JUDGE CHIN

# 08 CV 4910

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

James R. Bartholomew, on behalf of himself
and all others similarly situated,

                Plaintiff,

        v.

MORGAN STANLEY AND MORGAN
STANLEY & CO., INC,

               Defendants.

-------------------------------------------------------------x

No.
ECF Case

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
MAY 2 8 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

    1.    Plaintiff James R. Bartholomew brings this action on behalf of himself and all Morgan Stanley clients, as set forth more specifically herein, who have had the auction rate preferred stock or auction rate debt securities ("ARS") frozen by Morgan Stanley and been damaged thereby (the "Class").

    2.    ARS are complex long-term debt securities where the yield or interest rate is reset at periodic auctions held every week or month at which time the instruments could also be sold. The liquidity of the ARS depends on the functioning of these auctions and the auctions, in turn, depend on the participation of certain primary financial institutions. Morgan Stanley pledged to act as one of the primary institutions supporting the auctions for each of Plaintiff's ARS. The investment of Plaintiff's cash holdings in ARS was the result of a systematic advisory campaign by Morgan Stanley as Plaintiff's Financial Advisors. Morgan Stanley's undisclosed motivation for this advisory campaign was that Morgan Stanley obtained massive undisclosed fees – including a percentage annually of each ARS issue (¶ 37) – for acting as a primary participant in the ARS auctions. Plaintiff was approached by a Morgan Stanley "Financial Advisor" who

proposed and recommended that he be given consent to invest Plaintiff's cash holdings in ARS. Plaintiff's Morgan Stanley Financial Advisor recommended ARS as a higher yielding "cash alternative" to liquid investments such as money market funds.  Morgan Stanley Financial Advisors obtained Plaintiff's and the Class's to invest their cash in ARS without ever advising them of either the potential absence of liquidity attendant with ARS investments or any conflicts of interest between Plaintiff's and the Class's financial interests and those of Morgan Stanley in connection with the ARS.  Further, Defendants conducted this advisory campaign without reference to or direction that Plaintiff review any portion of ARS Prospectuses or Registration Statements filed with the United States Securities and Exchange Commission.  Plaintiff and the Class were thus induced to give their consent to their Morgan Stanley Financial Advisor to invest in ARS without being shown the applicable ARS's prospectuses or registration statements filed with the SEC, and without being advised of the potential absence of liquidity attendant with the ARS investment or the fundamental conflicts interest between their ARS holdings and the activities of Morgan Stanley as a principal ARS auction participant.

3.     Further, independent of any of the above specific misstatements and omissions made in connection with the ARS, Defendants as Plaintiff's Financial Advisors owed Plaintiff and the Class duties not act to advance Morgan Stanley's financial interests at their clients expense.

4.     Beginning on or about February 13, 2008, Morgan Stanley determined that it was no longer in its own financial interest to continue participating in ARS auctions.  In breach of duties owed to Plaintiff as Financial Advisors not to advance Morgan Stanley's financial interests at their clients' expense, Defendants ceased all ARS auction participation.  Morgan Stanley's actions ensured that the liquidity of their clients' ARS holdings was wiped out.

5.     Plaintiff asserts herein seven causes of action arising from the misconduct alleged herein. It is alleged Morgan Stanley violated the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1, *et seq*. ("IAA") (Count I) by, *inter alia*, misrepresenting the liquidity of the ARS investment, in failing to disclose liquidity risks and conflicts of interest attendant with the ARS investment (¶¶ 44-50) ("misrepresentation and omission allegations") and for failing to participate in the ARS auctions as pledged in order to advance defendants financial interests at their clients' expense (¶¶ 44-50) ("breach of duty allegations"). Plaintiff also alleges on behalf of himself and all purchasers of ARS not filed or registered under the Investment Company Act of 1940 claims against Morgan Stanley for violations of New York General Business Law § 349 (Count II) and negligent misrepresentation (Count III) arising from both the misrepresentation and omission allegations as well as breach of duty allegations. Finally, Plaintiff alleges claims for breach of fiduciary duty (Count IV), aiding and abetting breach of fiduciary duty (Count V), breach of the implied covenants of good faith and fair dealing (Count VI) and negligence (Count VII) against Morgan Stanley arising *exclusively* from the breach of duty allegations (¶¶ 51-83).

6.     Plaintiff's allegations are based upon knowledge as to himself and upon information and belief based upon, among other things, the investigation of his attorneys, including, a review of Defendants' public documents, filings with the United States Securities and Exchange Commission ("SEC"), applicable statutes, rules and regulations, communications by Defendants, and news articles and information readily obtainable on the Internet.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to alleged violations of Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq*., Section 349 of the New York General Business Law ("GBL"), breaches of fiduciary duty, aiding and abetting breaches of

fiduciary duty, and the implied covenant of good faith and fair dealing, as well as common law negligence and negligent misrepresentation.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as one of the causes of action arose from Defendants' violation of federal law, *i.e.*, the Investment Advisers Act, 15 U.S.C. 80b-14. Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) (diversity). Plaintiff and members of the proposed Class numbering hundreds of thousands are citizens of a State different from any of the Defendants. *See* 28 U.S.C. § 1332(d)(2)(A). The matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs. To the extent the court has federal question jurisdiction, it also has supplemental jurisdiction over the state law claims.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the Defendants participation in the ARS auction market occurred in this District. Further, venue is proper in this District pursuant to 15 U.S.C. § 80b-14. Each of the Defendants resides, is found, transacts business, or has an agent in this state and/or this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the internet and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff James R. Bartholomew ("Bartholomew") resides in Apopka County, Florida. Mr. Bartholomew at all times hereinafter mentioned maintained and continues to maintain an investment account with Defendant Morgan Stanley. A Morgan Stanley Financial Advisor contacted Mr. Bartholomew to suggest that Mr. Bartholomew invest in an ARS. The

Financial Advisor recommended, advised and falsely obtained Mr. Bartholomew's consent to allow the investment advisor to invest $825,000 cash in the following ARS holdings: Pennsylvania State Higher Education Assistance Student Loan Revenue Series–HH9; Pennsylvania State Higher Education Assistance Student Loan Revenue Series-HH10; Pennsylvania State Higher Education Assistance AGY-MM1; Greenpoint Manufactured Housing; Access 2003-1 A3. As a result of Defendants' breach of duty and misconduct, all of Bartholomew's ARS assets have been and continue to be frozen.

12.     Defendant Morgan Stanley is incorporated in Delaware and its principal executive offices are located in New York, New York. Morgan Stanley is one of the world's leading financial services firms.

13.     Defendant Morgan Stanley & Co., Inc. is incorporated in Delaware and its principal executive offices are located in New York, New York. Morgan Stanley & Co., a wholly-owned subsidiary of Morgan Stanley, is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA"). Morgan Stanley & Co. is one of the largest underwriters and broker-dealers of auction rate securities in the United States.

14.     Unless otherwise noted, "Morgan Stanley" refers collectively to defendants Morgan Stanley and Morgan Stanley & Co., Inc.

<u>**PLAINTIFF'S CLASS ACTION ALLEGATIONS**</u>

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class of Morgan Stanley clients as more specifically defined in the counts alleged herein, who have had their ARS holdings frozen by Morgan Stanley

and have been damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Morgan Stanley or its transfer agent and may be notified of the pendency of this action by mail, or the internet or publication using the form of notice similar to that customarily used in securities class actions.

17.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of statutory and common law complained of herein.

18.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Finkelstein Thompson LLP, counsel competent and experienced in class and securities litigation.

19.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Investment Advisers Act of 1940 was violated by Defendants' acts as alleged herein;

(b)    whether New York General Business Law §349 was violated by

Defendants' acts as alleged herein;

        (c)    whether Defendants breached its fiduciary and other duties owed to Plaintiff and other members of the Class;

        (d)    whether Defendants' acts complained of herein were a breach of Defendants' implied covenants of good faith and fair dealing;

        (e)    whether Defendants' acts complained of herein constituted negligence;

        (f)    whether Defendants violated NYSE and NASD Rules and/or failed to observe and warn of the risks associated with ARSs as stated in Financial Accounting Standards Board ("FASB") Rules FAS Nos. 95 and 115;

        (g)    whether Defendants' statements and acts complained of herein constituted negligent misrepresentations; and

        (h)    to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

    20.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Defendants Owed Duties To The Class As Registered**
**Investment Advisors And Financial Advisors**

    21.    At all relevant times Morgan Stanley was a registered investment advisor.

22.    As registered Investment Advisors and Financial Advisors, Defendants were obligated to advance the financial interests of their clients and not to permit their own financial self interest to override the interests of their clients.  Defendant Morgan Stanley represented that they served as Plaintiff's and the Class' "Financial Advisors."  Plaintiff and the Class relied on these representations.   In fact, Morgan Stanley assured it clients that as Financial Advisors they were focused on advancing the financial interests of their clients and not those of Morgan Stanley itself:

> You and your Morgan Stanley Financial Advisor, with access to the full scope of our services and resources, work closely towards achieving your financial success. *Your Financial Advisor is highly trained to understand your needs and to help you develop the financial strategies that can satisfy them—today and over the long term.*
>
> Through your Financial Advisor you benefit from Morgan Stanley's powerful capabilities: our respected investment research, high-quality debt and equity offerings, securities trading and asset management expertise, financial tools and teams of specialists. It's a multi-faceted collaboration that you'll find has much to offer.

http://www.morganstanleyindividual.com/ourcommitment/ (last visited May 21, 2008) (emphasis added).

**Defendants' Involvement In ARS-Market**

23.    The ARS market emerged in 1984.  It provided for safe investment in the securities, either bonds or preferred stock issued by municipalities and other creditworthy institutions or public funds.   The dividend or interest rate on these securities was reset at regularly scheduled auctions and these auctions also assured that if a holder wished to redeem or sell his holding he was able to do so.  The liquidity of the ARS market was one of it principal benefits for ARS investors.

24.    The Defendants, during the Class Period, were the second largest underwriter in the $330 billion ARS market.  Morgan Stanley's involvement in the ARS market had generated

substantial revenue for Defendants. In addition to its customary brokerage fees Morgan Stanley charges its clients in connection with their purchase or sale of ARS, Morgan Stanley collected substantial fees in connection with running the auctions that re-set the weekly or monthly interest rates on the ARS.

**Morgan Stanley's ARS Misstatements And Omissions As Financial Advisors**

25.     Defendants engaged in a systematic marketing effort as Financial Advisors to Plaintiff and the Class whereby Plaintiff and the Class were approached by their Morgan Stanley Financial Advisors and induced to give their consent for Morgan Stanley to invest their cash holdings in ARS. Plaintiff and the Class had no prior knowledge of ARS. Plaintiff and the Class were not shown or directed to read any ARS Prospectus, Registration Statement or other public filing. Plaintiff and the Class were told that the ARS were as liquid as cash or money market funds such that the funds were accessible as any time. Further, Plaintiff and the Class were induced to give their consent to the ARS investment because their Morgan Stanley Financial Advisor stated in addition to having the same liquidity as cash the ARS had the advantage of earning higher yields than money market funds or similar cash alternative investments. Each month the Morgan Stanley client account statements described the ARS as "cash alternatives."

26.     Defendants, acting as Plaintiff's Financial Advisors, also failed to disclose to Plaintiff and the Class the risk of illiquidity inherent in ARS in the event that primary auction participants failed to participate in ARS auctions. Defendants, acting as Plaintiff's Finanical Advisors, also failed to disclose conflicts of interest between Morgan Stanley and Plaintiff.

27.     Defendants violated the trust and confidence placed in them by their clients as Financial Advisors, and caused, allowed and permitted their clients who reposed confidence in them, to have their monies placed in ARS, allegedly as good as cash, instead of customarily

liquid investment products – *i.e.*, money market funds, treasury bills or FDIC-insured savings accounts – without disclosing the inherent risks of the ARS.

**Defendants' Duties As Financial Advisors**

28.     Acting as Plaintiff's Financial Advisor and independent of any misstatement or omissions made to their clients in connection with ARS, Defendant Morgan Stanley was bound not to act in a manner which advanced Defendant Morgan Stanley's financial interests at the expense of its clients.

**Auditors and the SEC Begin To Challenge "Cash"**
**Designation And Accounting Treatment For ARS**

29.     As reported in an article titled "Auction-Rate Securities: Hold that Gavel" in CFO.com on April 25, 2005, Big Four auditors, Ernst & Young ("E&Y"), in December 2004, first began advising clients to reclassify ARS as short-term investments and not "cash equivalents" as was the prior practice. E&Y's viewpoint was shared by the other Big Four audit companies and was endorsed by the Financial Accounting Standards Board ("FASB"), as follows:

*       *       *

Since December, when Ernst & Young first began advising clients to make the change, scores of CFOs have altered the accounting treatment for ARS. The new interpretation of two accounting standards is now endorsed by the Financial Accounting Standards Board, the Securities and Exchange Commission, and the Public Company Accounting Oversight Board, as well as all the Big Four auditors. (The reinterpreted standards are FAS No. 95, Statement of Cash Flows, and FAS No. 115, Accounting for Certain Investments in Debt and Equity Securities.)

A current SEC probe of the auctions, in which investigators are reportedly looking into alleged "bid rigging" within the ARS market, doesn't appear to involve accounting treatment of the securities. But the investigation led some audit clients to reevaluate their investments and later question the accounting treatment, according to an audit manager who preferred not to be identified. **After taking another look at the accounting rules, each of the Big Four concluded that a wholesale reinterpretation of the standards was needed, and the audit**

firms passed the word to their clients.

The accounting change might turn out be the latest crimp in corporate treasurers' use of what's long been seen as an effective cash-management tool. **The securities are long-term municipal and corporate bonds (usually with 20-year to 30-year maturities) that are priced and traded like short-term debt.**

**The reason for the resemblance to short-term debt is that ARS interest rates are reset through a Dutch auction.** In a Dutch auction, what sets the price is the bid with the lowest yield that would enable all the bonds in a single block to be sold. (A block of bonds is usually worth at least $200,000.) **Generally, the auctions are held every 7, 28, or 30 days, which gives finance executives a chance to liquidate their holdings when they need cash.**

(Emphasis added.)

30.    The SEC and the Public Company Accounting Oversight Board (PCAOB) have followed E&Y and the other auditors to "correct" the wrong application of accounting rules, as they relate to ARSs.    As reported on February 28, 2005 article in iTreasurer.com titled "The Brave New World of Regulatory Activism,"

\*      \*      \*

Under reported pressure from the Public Company Accounting Oversight Board (PCAOB) and the SEC, audit firms have been revisiting decades-old (and apparently seldom read) literature on auction-rate securities—i.e., should they be counted as "cash equivalent" on the balance sheet or be classified as FAS 115 securities?

**Waiting for the (third) shoe to drop**

No one believes that the SEC and auditors are changing the rules. **The guidance on auction-rate securities, for example, dates back to the late 1980s.** And so far, the impact on corporate financials does not appear too dramatic. But these seemingly unrelated initiatives may be symptomatic of a common trend:

"There's greater scrutiny of how companies apply existing accounting rules and how auditors are enforcing them," explains PricewaterhouseCoopers Senior Manager, Muneera Carr. In the wake of Enron and the Sarbanes-Oxley Act, "regulators are clearly playing a more active role."

These latest moves are not the first show of standard-setters "activism." EITF 03-1 was also initially conceived as clarification of preexisting rules on impairment (SAB 59).

Later, however, the FASB reconsidered whether indeed it was doing more than clearing up some old misconceptions. Perhaps more worrisome, however, the February initiatives are not going to be the last: As *International Treasurer* was going to press, sources said a third accounting "bombshell" was to drop; this one "would blow the other two out of the water," one accounting pro notes.

**What if it walks like a duck. . .**

Just how auction-rate securities suddenly reemerged as a hot issue is murky, and **this is not the first time there's been some discussion of whether they belong in the "cash equivalent" line on the balance sheet. The buzz is that the PCAOB raised the issue during a routine inspection of a local audit practice of a Big-Four audit firm. The disagreement was escalated to the SEC Staff. And the SEC reaffirmed the guidance present in auditing manuals—i.e., auction-rate securities may look and feel like cash, but they are in effect FAS 115 securities.**

It's also not entirely clear why for years, companies have gone on classifying auction-rate securities as cash equivalents, and auditors accepted. (From a practical standpoint, the securities are nearly always as liquid as cash and have little price risk, hence the designation.)

What's crystal clear is why this has become an issue—now. With SOX-driven focus on compliance, auditors are carefully monitoring clients' financials. And with years of rising cash assets, and declining returns, many corporates have turned to auction securities to enhance yield with little—if any—additional liquidity or market risk.

At stake, then, is where to put auction-rate securities, if the apparently prevalent "cash equivalent" classification under FAS 95 is wrong. And the worry among corporate treasurers is that the new balance sheet "geography" may adversely affect key liquidity ratios.

*Experts at E&Y and PwC say that the "cash-like" designation for auction-rate securities was almost never correct.* For example, E&Y guidance dating back to 1991 explains why auction-securities should not be considered cash equivalents under FAS 95.

(Emphasis added).

31.    Despite seemingly clear guidance from the SEC, the Big Four audit firms and the

PCAOB, Defendants continued to market ARS to Plaintiff and the Class as "Cash Alternatives"

in violation of FAS No. 95 and FAS No. 115.

**Defendants Breached Duties To The Class By Wiping Out Liquidity of Plaintiff's**
**ARS Holdings In Order To Advance Morgan Stanley's Own Financial Interests**

32.    In early-February 2008, the Morgan Stanley Defendants breached its duties to its clients by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions causing the ARS market to collapse when failing auctions largely outnumbered auctions that succeeded, leaving ARS investors stranded with illiquid investments.

33.    As a result of the ARS market collapse in February 2008, Plaintiff and other member of the Class were unable to sell their position in ARS.    Unable to liquidate their ARS holdings to cash, Plaintiff and other members of the Class were unable to meet their current financial obligations sustaining hardship and damages and forcing them to consider other alternatives to free up cash to meet current financial obligations.    Some members of the Class were forced to seek out buyers for their frozen ARS holdings and sell their holdings in an *ad hoc* secondary market at substantial discounts for purported "cash" investments – *e.g.*, 88% of face value.

34.    On February 26, 2008, *The Associated Press* issued an article entitled "Credit crunch turns Wall Street into a jungle," reported that investors and issuers, alike, "relied for years on the broker-dealer community supporting" the ARS auctions:

> Consider the auction-rate securities market, where municipalities, student-loan authorities and others issue debt with interest rates that reset every week to 35 days in bank-arranged auctions. Big banks like Citigroup Inc. and Goldman Sachs surprised investors recently when they decided not to backstop auctions of securities that garnered little demand by bidding for some of the debt themselves.
>
> *"We relied for years on the broker-dealer community supporting"* these securities auctions, says Paul Rosenstiel, deputy treasurer of California. *He said it was an "article of faith" that dealers would not let auctions fail. "We relied on and expected that kind of performance,"* he said.
>
> \*        \*        \*

"It's always been every investor for himself," says Mark Adelson, a principal of Adelson & Jacob Consulting LLC, which provides securitization consulting services. *"But their interests were not in conflict before and now they are."*

(Emphasis added.)

**Federal And State Regulatory Authorities Initiate Investigations
Into Morgan Stanley' Role In Auction Rate Securities Market Failure**

35.    A March 30, 2008 *New York Times* article entitled "If You Can't Sell, Good

Luck" further exposed the Morgan Stanley, and others, deception and breach of fiduciary duties:

\*        \*        \*

Investors in these securities almost certainly relied on their brokers' assurances that the [ARS] were safe and sound. That's because the sales were not accompanied by prospectuses outlining the risks.

But the brokerage firms made more on these securities than they would have made on sales of money market funds.

36.    On April 18, 2008, *The Washington Post* reported in an article "N.Y.'s Attorney

General Subpoenas Finance Firms" that New York Attorney General Andrew Cuomo had

launched a broad investigation into auction rate securities and had subpoenaed Morgan Stanley

for information:

New York Attorney General Andrew M. Cuomo has launched a wide-ranging criminal investigation of the market for auction rate securities, issuing subpoenas to 18 financial services companies, a source familiar with the inquiry said Thursday.

Auction rate securities are a troubled corner of the credit market that has left investors unable to access their money and local governments with higher financing costs.

Cuomo's office has requested documents from firms including Goldman Sachs, *Morgan Stanley*, J.P. Morgan, Merrill Lynch and UBS, said the source, who spoke on the condition of anonymity because the investigation is in its early stages

(emphasis added)

**Firms Such As Morgan Stanley Reported To Continue To Reap**
**Auction Fees While Failing to Participate In Auctions**

37. On May 4, 2008, *The New York Times* published an article entitled "How to Clear A Road to Redemption" that exposed the clear conflict of interest for investment banks, like Morgan Stanley, and the fees the investment banks continued to earn despite the fact that the auctions were failing:

> IT is Day 79 in the hostage crisis otherwise known as the auction-rate securities market. Some $300 billion worth of investors' funds -- advertised as being easy as pie to cash in -- are still locked up. And the brokerage firms that got investors into this mess are doing little to help.
>
> But investors trapped in these securities are not the only victims of this debacle; taxpayers are, too. That's because municipal issuers of auction-rate notes -- towns, school districts, hospitals, highway authorities and others -- are being asked to pay up to redeem and restructure the debt.
>
> *Even as investors and taxpayers are hurt by this frozen market, Wall Street is making money from it. In fact, the auction-rate securities mess is another illustration of damaging conflicts of interest at the nation's big brokerage firms.*
>
> Auction-rate securities are debt obligations issued by municipalities, nonprofit entities and closed-end mutual funds. Interest rates on the securities are set by periodic auctions, based on investor demand. The market froze in February when buyers disappeared, and brokerage firms refused to step in.
>
> *Naturally, investment bankers who agreed to operate these auctions were paid for their services: 0.25 percent of the security's total issue for each year of its life. Unnaturally, big firms still earn these fees even though 70 percent of the weekly auctions of these securities are failing.*
>
> *The firms also rake in banking fees when municipal issuers redeem the securities. They haul in another round of revenue when they help issuers unwind derivative contracts that are often intertwined with the securities.* These derivatives were designed to reduce costs for the issuers by hedging their interest rate risks. Thanks to the decline in interest rates, however, they can be frightfully expensive to unspool.
>
> By my arithmetic, that's Wall Street 3, Investors/Issuers 0.
>
> Sure, investors get interest on their  money --  but nowhere near enough to compensate for being stuck in their holdings.

(emphasis added.)

**Morgan Stanley Offers Clients Loans with Interest on Their Frozen
Assets To Continue To Profit From Failed ARS Market**

38.    On May 5, 2008, *Investment News* published an article entitled "Brokerage firms

struggle to finance auction-rate loans; Regulators provide some capital relief, but bank lenders

balk," reported Morgan Stanley would offer loans at rates to be negotiated with clients.

\*        \*        \*

*Retail brokers who have clients locked up in auction-rate securities generally
aren't happy with the rates clients have to pay to borrow against their holdings.*

*They feel their firms have backed away from an implicit promise to ensure
liquidity for these long-term securities that were sold as short-term, liquid
investments.*

Brokers say customers should get a break. "It seemed like the interest rate was
going to be fairly high," a broker at Wachovia Securities LLC of St. Louis said
about the firm's loan program. "It didn't seem very attractive," said the
representative, who asked not to be identified.

\*        \*        \*

*Morgan Stanley has had no problems establishing loans and lines of credit, said
spokesman Jim Wiggins. Rates are negotiated with clients.*

(emphasis added.)

**Defendants Blatantly Violated NASD Requirement
That Financial Advisors Proposed Transactions Be "Suitable"**

39.    Defendant Morgan Stanley is a member of the NYSE and the NASD.

40.    Defendants violated the bedrock principle of "know thy customer." NYSE Rule

405, "Diligence as to Account" (commonly referred to as the "Know thy customer rule"),

requires that "every member organization is required ... to (1) *Use due diligence to learn the*

*essential facts relative to every customer*, every order, every cash or margin account ...."

(Emphasis added).   In addition, NYSE Rule 342.17, "Review of communications with the

public", states: "Members and member organizations must develop written policies and

procedures that are appropriate for their business, their size, structure and customers in

16

connection with the review of communications with the public relating to their business." Further, NYSE Rule 472, Communications With The Public, sub-section (i) "General Standards for All Communications", states, in pertinent part: ***No member organization shall utilize any communication which contains (i) any untrue statement or omission of a material fact or is otherwise false or misleading,*** ..." and sub-section (j), "Specific Standards for Recommendations," states in part that "[a] recommendation (even though not labeled as a recommendation) must have a basis which can be substantiated as reasonable."

41.    Defendants violated the most basic NASD requirement that the financial transactions proposed by "Financial Advisors" to their clients be ***"suitable"*** meaning that they met the ***"customers' financial objectives."***  The false and deceptive marketing of ARSs as "Cash Alternatives" was clearly "unsuitable" and could only serve to meet only Defendants' financial objectives at their clients' expense.

42.    The NASD has also promulgated "suitability" rules governing a broker's relationship with its customers.  NASD Rule 2310 provides, *inter alia*, as follows:

**2310. Recommendations to Customers (Suitability)**

(a)    In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b)    Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

(1)    the customer's financial status;

(2)    the customer's tax status;

(3)    *the customer's investment objectives; and*

(4)    *such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.*

(Emphasis added).

43.    Defendants' conduct in connection with their marketing, consulting and advising Plaintiff and other Class members regarding ARS also violated NASD Interpretative Materials for Rule 2310, which mandate "fair dealing," with the public including the requirement to not issue fraudulent misrepresentations and omissions in connection with financial transactions:

**IM-2310-2. Fair Dealing with Customers**

(a)(1)    *implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing.* Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with *particular emphasis on the requirement to deal fairly with the public.*

(2)    this does not mean that legitimate sales efforts in the securities business are to be discouraged by requirements which do not take into account the variety of circumstances which can enter into the member-customer relationship. *It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed*, rather than on the argument that they result in profits to customers.

(Emphasis added).

## COUNT I

### Violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq.
(Against Defendant Morgan Stanley & Co.)

44.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

45.    Defendant Morgan Stanley, who is and was at all relevant times an investment adviser under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, entered into contracts with

Plaintiff and other members of the Class to provide financial advice. Defendant Morgan Stanley & Co., for compensation, engages in the business of advising Plaintiff and other members of the Class, either directly or through publications or writings, as to the value of "securities" or as to the advisability of investing in, purchasing, or selling "securities" as defined at 15 U.S.C. § 80b-2(11).

46.    The provision of an auction market by Morgan Stanley and the fees obtained as a result thereof are not incidental to the conduct of their usual brokerage business and Defendant Morgan Stanley receives special compensation therefore.

47.    Under the Investment Advisers Act, Defendant Morgan Stanley, as Investment Advisers, owed to Plaintiff and other members of the Class a fiduciary duty to not place their own interests before those of their clients, to refrain from any conflicts of interest and an affirmative obligation to employ reasonable care in serving their clients' financial interests.

48.    In breach of its duties, Morgan Stanley misrepresented that the ARS market was as liquid as a cash investments; failed to disclose the conflicts of interest inherent in the ARS investment and that the liquidity of the ARS investment depended on Morgan Stanley & Co. acting for the benefit of their clients as opposed to those of Morgan Stanley itself. In further breach of their fiduciary duties to Plaintiff and other members of the Class in violation of the Investment Adviser Act, Defendant Morgan Stanley failed to appear, provide bids and otherwise participate in regularly scheduled ARS auctions wiping out the liquidity of Plaintiff's ARS holdings.

49.    As a result of Defendant Morgan Stanley's fiduciary duty breaches, Plaintiff's and other Class members' purchases, investment, or acquisition of ARSs are void under Section 15 of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), which provides:

Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

50.    In addition to seeking a declaratory judgment that the ARSs transactions with Plaintiff and the Class are void, Plaintiff seeks to restore Plaintiffs financial position held prior to Morgan Stanley's freezing of Plaintiff's ARS holdings and any other remedies permissible under the Investment Advisers Act.

### COUNT II

#### Violation of the New York General Business Law § 349
(Against Defendant Morgan Stanley & Co.)

51.    Plaintiff James R. Bartholomew and all similarly situated persons were advised by Morgan Stanley to purchase ARS not issued by an investment company that is registered or that filed a registration statement under the Investment Company Act of 1940.  Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.

52.    Section 349 of the New York's General Business Law states:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

53.    As set forth above, Defendants' deceptive, acts, practices whereby defendants falsely represented to Plaintiff and similarly situated Class members that they were bound by duties as Investment Advisors and Financial Advisors who would primarily advance the financial interests of their clients.  Defendants breached such duties by failing to appear, provide bids and

otherwise participate in regularly scheduled ARS auctions, thereby freezing the ARS holdings of the Class in order to advance the financial interests of defendants at their clients' expense. Defendants' conduct and actions, as described above, constitute deceptive business practices in violation of the GBL.

54.     The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by Defendants' deceptive business practices.

55.     As a result of Defendants' actions, Plaintiff and other Class members have been injured and damaged in an amount to be determined at trial.

## COUNT III

### Negligent Misrepresentation
(Against Defendant Morgan Stanley & Co.)

56.     Plaintiff James R. Bartholomew and all similarly situated persons who were advised by Morgan Stanley to purchase ARS not issued by an investment company that is registered or that filed a registration statement under the Investment Company Act of 1940. Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.

57.     Defendants' above-described misrepresentations and conduct in connection with Plaintiff and other Class members investment in non-Investment Company ARS were false and misleading, in violation of their duties to Plaintiff and the Class.

58.     Defendants were negligent in making the above-described misrepresentations, concealment and omissions of material facts.

59.     Defendants' misrepresentations and omissions concerning the ARS, including the liquidity risks inherent in ARS and the proper designation of ARS as short-term investment and not cash equivalents, were material in Plaintiff and the other Class members' decision include

21

ARS as part of their cash management investment strategy.

60.    Plaintiff and other Class members justifiably relied upon such misrepresentations, concealment and omissions to their damage and detriment.

61.    The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' misrepresentations, concealment and omissions.

62.    As a result of Defendants' actions, Plaintiff and the other Class members have been damaged and injured in an amount to be determined at trial.

## COUNT IV

### Breach of Fiduciary Duty
(Against Defendant Morgan Stanley & Co.)

63.    Plaintiff repeats and reiterates the allegations as set forth above except to exclude any and all allegations that Defendants made material misrepresentations and omission in connection with the purchase and sale of ARS securities.  This cause of action arises solely from allegations of alleged breach of fiduciary duties owed to Plaintiff.

64.    Defendants, through their agents and representatives, held themselves out as financial advisors to Plaintiff and other Class members, and as such owed fiduciary duties to Plaintiff and the other Class members.  The Defendants breached their fiduciary duties by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby freezing the ARS holdings of the Class in order to advance the financial interests of defendants at their clients' expense.

65.    As a result of Defendants' breach of fiduciary duties, Plaintiff and other members of the Class have suffered damage in the form of lost earnings on their funds, and Defendants have profited at Plaintiff and the Class's expense in an amount to be determined at trial.  The

damages sustained by Plaintiff and other Class members were a direct and foreseeable result, and were proximately caused by, Defendants' breaches of their fiduciary duties.

66.    The Defendants' conduct was willful, wanton, and reckless.    Based on the intentionally dishonest nature of the Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should also be held liable to the Class for punitive damages, in an amount to be determined at trial.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty
(Against Defendant Morgan Stanley)

67.    Plaintiff repeats and reiterates the allegations as set forth above except to exclude any and all allegations that Defendants made material misrepresentations and omission in connection with the purchase and sale of ARS securities.    This cause of action arises solely from allegations of alleged breach of fiduciary duties owed to Plaintiff.

68.    As set forth above, Defendant Morgan Stanley breached its fiduciary duties to Plaintiff and the Class.

69.    Defendant Morgan Stanley for its financial benefit, knew of, knowingly induced or participated in, permitted, and provided substantial assistance to, the fiduciary breaches by its subsidiary brokerage and by, *inter alia*, orchestrating and directing Defendant Morgan Stanley & Co. to participate in the ARS market, and reviewing and approving or ratifying Morgan Stanley & Co.'s decision to fail to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby freezing the ARS holdings of the Class in order to advance the financial interests of Defendants.

70.    The damages sustained by Plaintiff and the Class were a direct and foreseeable

result of, and were proximately caused by Defendant Morgan Stanley's aiding and abetting conduct.

71.    As a result of Defendant Morgan Stanley's actions, Plaintiff and the other members of the Class have been damaged and injured, and Defendant Morgan Stanley and their subsidiaries have been unjustly benefited, in an amount to be determined at trial.

72.    Defendant Morgan Stanley's conduct was willful, wanton, and reckless. Based on the intentionally dishonest nature of Defendant Morgan Stanley's conduct, which was directed at the Class and at the public generally, Defendant Morgan Stanley should also be held liable to the Class for punitive damages in an amount to be determined at trial.

## COUNT VI

### Breach of the Implied Covenants of Good Faith and Fair Dealing
(Against Defendant Morgan Stanley & Co.)

73.    Plaintiff repeats and reiterates the allegations as set forth above except to exclude any and all allegations that Defendants made material misrepresentations and omission in connection with the purchase and sale of ARS securities. This cause of action arises solely from allegations of alleged breach of the implied covenants of good faith and fair dealing owed to Plaintiff.

74.    In connection with the retention of Morgan Stanley & Co. as a financial or investment advisor or broker-dealer, there is an implied covenant of good faith and fair dealing on the part of Morgan Stanley & Co. to Plaintiff and the Class.

75.    Morgan Stanley & Co breached the covenant of good faith and fair dealing by, among other things, by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby freezing the ARS holdings of the Class in order to advance the financial interests of defendants at their clients' expense.

76.    By reasons of the foregoing, Plaintiff and other members of the Class are entitled to compensatory damages in the amount to be determined at trial.

77.    Defendants' conduct was willful, wanton, and reckless.    Based on the intentionally dishonest nature of Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should be held liable to Plaintiff and other Class members for actual damages as well as punitive damages in an amount to be determined at trial.

## COUNT VII

### Negligence
(Against Defendant Morgan Stanley & Co)

78.    Plaintiff repeats and reiterates the allegations as set forth above except to exclude any and all allegations that Defendants made material misrepresentations and omission in connection with the purchase and sale of ARS securities.  This cause of action arises solely from allegations of alleged breach of fiduciary duties owed to Plaintiff.

79.    The Defendants' held themselves out to be investment and financial advisors, owed to Plaintiff and other Class members a duty of care including not to take steps to undermine the liquidity of Plaintiff's ARS holdings and to continue to participate in regularly scheduled ARS auctions.

80.    The Defendants breached their duty of care, *inter alia*, by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby wiping out the liquidity of the Class in order to advance the financial interests of defendants at their clients' expense.

81.    The Defendants' conduct as described herein was, at minimum, negligent.

82.    The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' breaches of their duty and

negligent conduct.

83.    As a result of the Defendants' actions, Plaintiff and the other Class members have been damaged and injured, in an amount to be determined at trial.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying the Named Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Declaring that the Defendants' ARS transactions with the Plaintiff and other member of the Class are void;

C.    Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Seeking disgorgement of any and all monies Defendants realized from the ARS transactions with Plaintiff and other member of the Class;

E.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including interest, counsel fees and expert fees; and

F.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


DATED:  New York, New York
        May 28, 2008

                                        SCHOENGOLD SPORN LAITMAN &
                                        LOMETTI, P.C.

                                        _____
                                          Samuel P. Sporn (SPS-4444)
                                          Joel P. Laitman (JL-8177)
                                          Frank R. Schirripa (FS-1960)
                                        19 Fulton Street, Suite 406
                                        New York, New York 10038
                                        Telephone: (212) 964-0046
                                        Facsimile (212) 267-8137

                                        *Local Counsel*

                                        FINKELSTEIN THOMPSON, LLP
                                          Burton H. Finkelstein, Esq.
                                          Donald J. Enright, Esq.
                                          Michael G. McLellen, Esq.
                                          Elizabeth K. Tripodi, Esq.
                                        1050 30th Street, N.W.
                                        Washington, D.C. 20007
                                        Telephone: (202) 337-8000
                                        Facsimile: (202) 337-8090

                                        *Attorneys for Plaintiff James R.
                                        Bartholomew*